UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jonathan Thomas Pirolo, | ) | Civil Action No. 5:19-cv-2881-KDW |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| Andrew M. Saul, Commissioner of Social Security, | ) ) ) ) | ORDER |
| Defendant. | ) ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying his claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court affirms the Commissioner's decision for the reasons discussed herein.

I.    Relevant Background

   A.    Procedural History

On August 18, 2017, Plaintiff filed an application for DIB alleging a disability onset date of July 1, 2016. Tr. 160. His claim was denied initially, Tr. 100-03, and upon reconsideration, Tr. 104-08, and Plaintiff requested a hearing, Tr. 110-11. On March 14, 2019, a hearing was held before an Administrative Law Judge ("ALJ") and testimony was taken from Plaintiff, who was represented by counsel; Plaintiff's wife; and a vocational expert ("VE"). Tr. 33-64. On April 9, 2019, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 12-32. Plaintiff requested review of the decision from the Appeals Council, Tr. 155-56, and the Appeals Council denied review on August 7, 2019, making the ALJ's decision the Commissioner's final

decision for purposes of judicial review, Tr. 1-6. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed October 11, 2019. ECF No. 1.

B.     Plaintiff's Background

Born in February 1984, Plaintiff was 32 years old on his alleged onset date of July 1, 2016. Tr. 160. In his initial Disability Report-Adult form Plaintiff noted that he completed three years of college in August 2015, and indicated, under specialized job training, that he was a Navy Seal with basic underwater demolition seal training. Tr. 199. He listed his past relevant work ("PRW") as a Navy Seal from September of 2008, to present. *Id.* Plaintiff indicated that he was currently working, but the following medical conditions limited his ability to work: PTSD, left shoulder, right shoulder, bilateral disorder of accommodation eyes, right knee, cervical degenerative arthritis, lumbosacral degenerative arthritis, traumatic brain disorder, sleep apnea, and tinnitus. Tr. 198. Plaintiff indicated that he was 5'11" tall, weighed 240 pounds, and his conditions caused him pain or other symptoms. *Id.*

C.     Administrative Proceedings

Plaintiff appeared with counsel in Charleston, South Carolina for his administrative hearing on March 14, 2019. Tr. 33. Plaintiff's wife and VE Dawn Bergren also appeared and testified. *Id.*

1.   Plaintiff's Testimony

In response to questions from the ALJ Plaintiff testified his date of birth was February 27, 1984, and he had attended "some college" when asked about his highest level of education.  Tr. 37. Plaintiff agreed he had attended college "last semester" at National University but was not immediately returning so that he could focus on his medical appointments and pain management. *Id.* He testified that his wife was pursuing a Master's degree, and he intended to return to college

2

after taking a break. *Id.* Based on where he was living with his family, Plaintiff explained that he was attending college 100% online. Tr. 38.

Plaintiff testified he last worked when he was in the Navy and was placed on limited-duty status in July of 2016. Plaintiff explained that he was still getting paid, but, in the Temporary Duty Limited program the primary focus should be one's medical appointments. Tr. 38-39. Plaintiff testified that despite the focus on medical appointments, in the program "they place you under supervision of a chief who doesn't have the same intent as the program. His prerogative is his department." Tr. 39. He testified he often had some conflict with his chain of command concerning his purpose in the program. *Id.* Plaintiff explained that in his limited-duty status, he did not really have any duties, and during the day he reported to his medical appointments at the hospital. *Id.* He explained that on days he did not have medical appointments he "simply stood or sat at a chair while other folks without disabilities were doing the primary duties." *Id.* Plaintiff agreed he was not doing work in the program, including clerical work. *Id.*

Plaintiff testified that prior to entering the program, he was a Navy Seal for 15 years. Tr. 40. He testified he worked as a Maritime Operations Instructor for the first six months of 2016. *Id.* In that role Plaintiff and other instructors trained all the west coast Navy Seals in small boat rivering and diving operations. *Id.* Plaintiff explained his instructor role ended because of his inability to focus. Tr. 41. Plaintiff explained he was having trouble sleeping and experienced post-traumatic stress symptoms. *Id.* Plaintiff testified that prior to working as an instructor, during 2013 to 2015, he worked as a dog handler and as a communications and joint terminal attack controller where he "coordinated fires with pilots, Navy F-18 fighter pilots." *Id.* From 2004 to 2013, Plaintiff testified he was in BUD/S training, or Navy Seal training. Tr. 41-42. Plaintiff testified he spent some time in North Carolina doing combat medic training. Tr. 42. He described his work in the

3

Navy as deployments, communications, weapons handling, firearms instructing, liaison to other government agencies, and so on. *Id.*

Plaintiff agreed that the reason he was unable to work was because he could not maintain concentration and persistence, and he experienced social limitations. *Id.* When asked what would prevent him from performing less demanding work on a fulltime basis, Plaintiff testified that he has trouble in public settings. Tr. 42-43. When asked what would prevent him from working in a smaller work space where he is not in a public arena but working with some other people with routine supervision, Plaintiff testified he would not be able to sustain that kind of work because he has "an affinity for violence in [his] mind." Tr. 43. He agreed he cannot work around other people, and he testified that he has a tendency to break things. Tr. 43-44. Plaintiff testified that he has a tendency to be on alert when he sees people wearing hijabs or burkas, and when he is on the road, he will follow people he finds to be suspicious. Tr. 44. Plaintiff testified that he experiences disturbing nightmares that prevent him from getting adequate sleep, and the lack of sleep causes him to take naps three-to-four times a day. Tr. 45. Additionally, Plaintiff explained that he has sleep apnea and uses a machine to help with it. *Id.* Plaintiff testified the machine helps him breathe at night, but he still has bad nightmares. Tr. 46.

Further, Plaintiff testified he has insomnia, issues falling asleep, headaches, and pain. *Id.* Plaintiff testified he is not being treated for pain, but he has degenerative discs in his neck. *Id.* Plaintiff testified he has had MRIs, and he is following up concerning what treatment is available to him. Tr. 47. Plaintiff testified that his neck issues affect his shoulders and arms because the pain radiates down his right arm. *Id.* He testified this issue causes numbness and tingling in his fingers and hand, causing him inability to grip things. Tr. 48. Plaintiff testified the issue might cause him to drop a glass and limit his ability to use his hand for fine manipulations. *Id.* He testified

4

he only wears slip-on shoes and rather than typing, he uses voice-to-text function on his computer. Tr. 48-49.

### 2. Testimony of Plaintiff's Wife

Plaintiff's wife testified she has been married to Plaintiff for twelve years. Tr. 50. She testified that in the past year, she has noticed Plaintiff experiencing problems with his daily functioning. *Id.* She explained Plaintiff is having issues with sleep, taking care of himself, and his memory. Tr. 51. Mrs. Pirolo testified he is having nightmares and wakes up during the night. *Id.* She recalled that when he wakes up, he will remove his CPAP mask, and she will have to make him put it back on. *Id.* She testified these sleeping issues happen almost every night, and Plaintiff will tell her about his nightmares. Tr. 52. She opined that the nightmares have gotten worse because the doctors decreased his Prazosin so that he is not so groggy during the day. *Id.* She agreed that Plaintiff is groggy during the day and sleeps during the day. Tr. 52-53. Specifically, she testified that she sees him asleep on a recliner about three-to-four days a week. Tr. 53.

Plaintiff's wife opined that Plaintiff would likely be unable to sustain a job where he is required to tolerate supervision and be in proximity to coworkers because he does not take feedback very well. Tr. 53. Additionally, she testified that he does not accept supervision, has difficulty with scheduling, consistency of his moods, and an inability to sleep. Tr. 53-54. Further, she agreed that Plaintiff would be off task, would fail to show up at certain times, and would miss days. Tr. 54. Plaintiff's wife estimated that Plaintiff could miss an average of eight or more days of work in a month. *Id.* She recalled Plaintiff was enrolled in online college courses—that he was taking basic courses like history and writing, but he stopped. *Id.* She testified that Plaintiff would not do his work, had a hard time remembering assignments, understanding what to do, signing in when he needed to, and checking the discussion board. Tr. 54-55. Though his grades were good,

5

Mrs. Pirolo testified that Plaintiff could sign up for a class but then fail to show up and have to cancel it. Tr. 55. She testified she tried to keep him on task and help out as much as she could. Tr. 55. Concerning Plaintiff's issues with social settings, Mrs. Pirolo testified that they do not go anywhere that is not absolutely necessary, especially a mall or a sporting event. Tr. 55-56. She testified that if they go into a social setting, like a restaurant, Plaintiff will blow up and get angry over almost anything, like people getting too close to him. Tr. 56. She agreed Plaintiff is easily provoked, hypervigilant, and paranoid. Tr. 56-57. She testified that she has not seen him become violent in public, but at home, when he is provoked, he will break things. Tr. 57. She testified that criticism, even constructive criticism can cause him to become violent. *Id.*

Upon questioning by Plaintiff's counsel, Mrs. Pirolo testified that they no longer have friends that come over. Tr. 57. She testified they stopped having people come over because of the way Plaintiff acts—he gets very nervous, unnatural, and upset such that it is uncomfortable for other people. Tr. 57-58. She testified that in the past Plaintiff has been physically violent toward her. Tr. 58. She testified that they separated for a time but were back together. *Id.* She testified she tries not to say anything that could upset Plaintiff, and if he does become upset, she explained that she and the children will leave the room or even the house. Tr. 58-59. Mrs. Pirolo testified that at one time he tried to take the children to school, but they were often late because he has trouble in the mornings—he is in a fog for about an hour or two. Tr. 59.

Upon requestioning by the ALJ, she recalled that at one time, a lady came to help Plaintiff with daily activities like laundry, scheduling, and writing. Tr. 60. However, she testified that the arrangement ended when they moved away from San Diego. *Id.* She explained that once she was no longer working, Plaintiff no longer needed outside help, so they did not reapply for those services. *Id.*

6

### 3. VE's Testimony

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience, with an exertional level limited to light work and the following limitations:

> [O]ccasional posturals; no climbing ladders, ropes, or scaffolds; may frequently but not constantly reach, handle, finger, and feel with the dominant upper extremity; would be limited to simple, routine tasks that could be accomplished in two hour increments, followed by customary breaks; no fast-paced production requirements; no public interaction; only superficial interaction with coworkers, meaning the individual could work in proximity to others, but shouldn't have to engage with them as part of the job duties; and shouldn't work in crowded spaces; might miss a day of work per month.

Tr. 62. The VE identified the following available jobs as follows: small parts assembler, DOT 706.684-022, SVP of 2, and nationally 195,000 jobs; electronics worker, DOT 726.687-010, SVP of 2, and nationally 29,000 jobs; and shipping/receiving weigher, DOT 222.387-074, SVP of 2, nationally 91,000 jobs. Tr. 62-63.

In his second hypothetical the ALJ added the additional limitation of zero interaction with others to the first hypothetical, and the VE testified there would be no available work because no work is performed in isolation. Tr. 63. In the third hypothetical, the ALJ returned to the first hypothetical and added the limitation that the individual would be absent three times in a month, and the VE testified there would be no work available under the third hypothetical. *Id.*

## II.     Discussion

### A.     The Commissioner's Findings

In his April 9, 2019 decision, the ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

7

2.  The claimant has not engaged in substantial gainful activity since July 1, 2016, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant has the following severe impairments: degenerative disc disease (DDD), disorders of the muscle, ligaments, and fascia, posttraumatic stress disorder (PTSD), and depression (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b). The claimant can occasionally perform postural activities, but never climb ladders, ropes, or scaffolds. He can frequently reach, handle, and finger. The work which he can do is limited to the performance of simple, routine, repetitive tasks for 2-hour increments, followed by customary breaks. The claimant cannot work where there is fast-paced production work. He can have no public interaction, and only occasional and superficial interaction with co-workers. The claimant can do no work in crowds. He is expected to miss about 1 workday per month.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on February 27, 1984 and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

> 11.   The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. 10-28.

    B.    Legal Framework

        1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW; and (5) whether

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his

9

the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

---

impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C. Analysis

Plaintiff alleges that the ALJ erred by (1) ignoring the Veterans Administration finding that Plaintiff was 100% disabled and its underlying evidence; (2) failing to comply with SSR 16-3p in

11

failing to follow proper standards for credibility; and (3) not finding Plaintiff disabled based on the testimony of the vocational expert. Pl.'s Br. 1, 4-12; ECF No. 19. The Commissioner argues that Plaintiff's initial argument to the court fails because it is based on a prior version of the regulations that are not applicable to this case. Def.'s Br. 1, 8-15; ECF No. 29. Further, the Commissioner maintains that the ALJ offered valid reasons supported by the record for discounting Plaintiff's subjective statements and was not required to adopt the limitations posed to the VE in hypothetical questions. *Id.* at 1; 15-22. In Reply, Plaintiff argues that the ALJ failed to consider crucial underlying evidence supporting the VA's rating. Pl.'s Reply, 1-3; ECF No. 37. Additionally, he argues that the VE's testimony is supported by unrebutted evidence. *Id.* at 3-5.

　　1. The ALJ's Consideration of VA's disability finding

　　By decision dated November 8, 2017, the VA declared Plaintiff's total combined rating for service-connected disabilities was 100%. Tr. 167-172. The VA decision indicated that medical evidence reviewed supported a 70% rating for the Plaintiff's PTSD, 40% rating for lumbosacral degenerative arthritis, 20% for left shoulder strain; 20% for right shoulder impingement syndrome and sternoclavicular joint strain; 20% bilateral eye disorder of accommodation; 10% right knee patellofemoral pain syndrome and meniscal tear, status post medial meniscal repair; 10% cervical degenerative arthritis; 10% tinnitus; and 10% right-sided articular disc disorder reducing with masticatory myalgia. Tr. 170-71.

　　As an initial matter, the undersigned finds that although *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337 (4th Cir. 2012), is still good law in this circuit, the portion discussing the treatment of VA disability ratings is not applicable to Plaintiff's application. In *Bird*, the Fourth Circuit addressed the weight that should be given to VA disability determinations and found as follows:

> Thus, we hold that, in making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

699 F.3d at 343. However, this part of the holding in *Bird* relies upon regulations that have now been amended by the SSA as well as a Social Security Ruling ("SSR") that has been rescinded effective March 27, 2017. *See Bird*, 699 F.3d at 342–43 (citing 20 C.F.R. §§ 404.1504; 404.1512(b)(5); SSR 06-03p). For applications filed on or after March 27, 2017, the applicable regulation has been amended to read that the SSA:

> will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim . . . .

20 C.F.R. § 404.1504; § 404.1512 (subsection referencing decisions cited in § 404.1504 deleted as of March 27, 2017); SSR 06-03p (rescinded effective March 27, 2017). Here, as noted above, Plaintiff's application for DIB was filed on August 18, 2017. Tr. 187-194. As such, the court agrees with the Commissioner that the holding in *Bird* regarding the treatment of VA disability ratings is not applicable to Plaintiff's case because his application was filed after March 27, 2017.

The Fourth Circuit has acknowledged that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [his] decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). In compliance with the mandates of the regulations, the ALJ did not provide "articulation about evidence that [was] inherently neither valuable nor persuasive, such as disability ratings from other governmental agencies." Tr. 26. *See* 20 CFR § 404.1520b(c)(1)-(3)(2017)(indicating that "[d]ecisions by other governmental agencies and nongovernmental

13

entities" are inherently neither valuable nor persuasive to the issue of whether a claimant is disabled). However, the ALJ considered the evidence underlying the VA disability rating in compliance with the correct regulatory framework. *See* 20 CFR § 404.1504 (indicating that the ALJ will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision but is not bound by the decision concerning whether the claimant is disabled). The ALJ's decision contains an analysis of Plaintiff's treatment with the VA, including military-related medical evidence from the VA's disability rating, including Plaintiff's mental health records from 2016 through 2018. Tr. 22-25. For example, in evaluating Plaintiff's PTSD diagnosis, the ALJ discussed Plaintiff's initial symptoms and initial treatment plan by noting:

> He reported increased hypervigilance, difficulty concentrating, attentional issues related to completing basic tasks, memory loss, exaggerated startle response, difficulty falling and staying asleep, low frustration tolerance, and being in a toxic marriage. [Plaintiff] displayed mixed personality features and numerous psychosocial stressors which might interfere with his ability to remain focused on PTSD treatment. In addition, [Plaintiff] was described as both clinically and administratively complicated with a history of making excuses, ongoing marital strain, and pervasive avoidance.

Tr. 22. Additionally, the ALJ noted a medical entry from Dr. April Barnett indicating Plaintiff has no consequences through work and had complete support from his chain of command. . . ." *Id.* Though the ALJ noted Plaintiff was described as motivated for treatment, he found that Plaintiff was "non-compliant with the initial treatment recommendations by Substance Abuse rehabilitation Program (SARP) as he had not attended daily AA meetings. Tr. 23. OASIS (Overcoming Adversity and Stress Injury Support) records also indicated that Plaintiff did not comply with mandates of the program and was ultimately discharged due to his inability to be compliant with the expectations of the program. *Id.* Despite ongoing anger impulses, Plaintiff was "fit for duty" and was recommended for light duty with certain limitations. *Id.*

The ALJ noted Plaintiff presented to the ER on February 6, 2017, after having homicidal thoughts and later attended bi-monthly psychotherapy sessions for primary symptoms caused by PTSD, paranoid ideation, and major depression. Tr. 23-24. The ALJ considered Plaintiff's mental health records from August of 2017, including his symptoms, reported impairments, and medication effects. Tr. 24. Psychiatric records from January of 2018, indicated Plaintiff stated that he was "doing ok," had decreasing anxiety, was sleeping well, and alcohol abuse was in remission. *Id.* In referencing records from August of 2018, the ALJ noted that Plaintiff had established care with a VA mental health provider, and records indicated he was driving his children to school daily. Tr. 25. Further, these records indicated that "[Plaintiff] had not had thoughts of suicide in the past year, [and his] mental health complaints revolved mainly around stress/anxiety over situational stressors. His mental status examinations were generally unremarkable. He was described as cooperative and attentive, with fair judgment and insight." *Id.* Further, the ALJ referenced VA records from December of 2018, indicating Plaintiff did not meet threshold requirements for a Comprehensive Assistance for Family Caregivers Program "as a result of significant activity of daily living deficits or supervision/protection needs related to post September 11, 2001, line-of-duty injury." *Id.* Further, the team determined Plaintiff's mental health records did not reflect a need for supervision or protection of a paid caregiver and also were not evidence of a severe cognitive impairment. *Id.* The ALJ found that a January 2019 record indicated that Plaintiff reported to have gotten out more, and it was more tolerable. *Id.* Further, records indicated Plaintiff was one year away from completing his bachelor's degree, and Plaintiff reported he was doing okay in the courses and trying to maintain A grades. *Id.*

Plaintiff argues that the ALJ only cited "cherry-pick[ed]" information from his October 2018 Compensation and Pension Exam and ignored important findings from the Exam. Pl. Br. 7.

15

Concerning this record, as partially indicated above, the ALJ indicated:

> Records dated October 22, 2018, note that [Plaintiff] had not had thoughts of suicide in the past year. [Plaintiff's] mental health complaints revolved mainly around stress/anxiety over situational stressors. His mental status examinations were generally unremarkable. He was described as cooperative and attentive, with fair judgment and insight. [Plaintiff endorsed some anger and impulse control issues. He noted that he had some nightmares. [Plaintiff] said that he did not like social settings.

Tr. 25. The undersigned finds the ALJ's discussion of Plaintiff's medical treatment, including the medical evidence used in conjunction with his VA disability rating was sufficient and in compliance with the regulatory framework. As noted by the Commissioner, the ALJ's decision includes a thorough discussion of Plaintiff's VA treatment records. Tr. 22–25. Accordingly, in light of the foregoing, the undersigned finds that the holding regarding VA disability ratings in *Bird* is inapplicable in this matter and further finds that the ALJ's decision appropriately discusses the evidence underlying the VA disability rating, as required by the regulations amended as of March 27, 2017.

2.  Credibility Determinations and compliance with SSR 16-3P

Plaintiff argues that the ALJ did not comply with SSR 16-3p because he failed to follow proper standards for credibility evaluations and mischaracterized the testimony of Plaintiff and his wife in describing Plaintiff's limitations. ECF No. 19 at 1, 8-9. In response, the Commissioner argues that substantial evidence supports the ALJ's subjective statement analysis. ECF No. 29 at 15-20.

SSR 16-3p provides a two-step process for evaluating an individual's symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment "that could reasonably be expected to produce the individual's alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *3. In the second step the ALJ must "evaluate the intensity and persistence of an

16

individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities . . .." *Id.* at *4.

The ALJ considered Plaintiff's subjective statements by using the two-step process outlined above. *See* Tr. 22-26.  The ALJ discussed Plaintiff's claims regarding his symptoms and explained his subjective statements were not completely consistent with the medical evidence and his activities of daily living. Tr. 22. The ALJ discussed Plaintiff's and his wife's testimony, noting that Plaintiff was enrolled in college classes for a time and went on limited-duty status with the Navy. *Id.* The ALJ indicated that Plaintiff testified he was unable to work due to problems with concentrating, memory problems, and social limitations. *Id.* The ALJ also recalled the triggers Plaintiff mentioned in his testimony. *Id.* Plaintiff's wife's testimony was noted, including her testimony that Plaintiff was easily provoked and violent. *Id.*

After reviewing psychiatric and orthopedic records, the ALJ found that though Plaintiff alleged an inability to sustain work due to social limitations related to PTSD, this testimony was inconsistent with the record. Tr. 26.  The ALJ relied on Plaintiff's psychiatric treatment notes and activities of daily living in discounting these allegations. *Id.* Specifically, he found "[Plaintiff's] mental status examinations were routinely unremarkable and do not suggest chronically marked social limitations." *Id.* Further, the ALJ noted Plaintiff's desire to work with other veterans in a support role. *Id.* He also noted that Plaintiff's request for a caregiver was denied because the evaluator did not find significant deficits in Plaintiff's activities of daily living or a significant cognitive impairment. *Id.* After considering this evidence, the ALJ determined that "a finding that [Plaintiff] was incapable of all work activity is not supported by the evidence of record as a whole. . . ." Tr. 27. The ALJ provided citations to the record to support the inconsistencies he cited. Tr. 22-27. Based on the undersigned's review of the record and applicable law, the undersigned finds

17

that the ALJ's decision reflects that he followed the two-step process in evaluating Plaintiff's symptoms. The ALJ also pointed to evidence in the record to support his conclusion.

### 3. Weight afforded VE testimony

Plaintiff contends that the ALJ erred in not finding Plaintiff disabled based on the VE's testimony. ECF No. 19 at 9-12. He argues that the ALJ is obligated to set out all of the Plaintiff's impairments in hypothetical questions posed to the VE, and here, the second and third questions posed to the VE were more consistent with the evidence, including the testimony of Plaintiff and his wife. *Id.* at 11. The Commissioner argues substantial evidence supports the ALJ's reliance on the VE testimony in determining that Plaintiff could perform other jobs. ECF No. 29 at 21-22.

Plaintiff cites to the VE's testimony that all jobs would be eliminated if he could not tolerate interaction with others, even people that are in proximity to them and supervisors, on a sustained basis. ECF No. 19 at 9. Additionally, Plaintiff cites to the VE's testimony that all jobs would be eliminated if he needed to be absent from work three days a month. *Id.* at 10-11. At the administrative hearing the ALJ posed three different hypotheticals to the VE. His first hypothetical included certain physical limitations and limitations for simple, routine tasks, followed by customary breaks; no fast-paced production requirements; no public interaction, and only superficial interaction with coworkers, but shouldn't have to engage with them as part of the job duties; shouldn't work in crowded spaces; and might miss a day of work per month. Tr. 62. The VE identified three jobs that the individual could perform. Tr. 62-63. In her second and third hypotheticals, with the added limitations zero interaction with others on a sustained basis and increased monthly absences, the VE testified that under both scenarios, there would be no jobs the individual could perform. Tr. 61-62.

"The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker v. Bowen*, 889 F.2d at 50. "[R]equiring the testimony of a vocational expert is discretionary[,]" *Hall v. Harris,* 658 F.2d 260, 267 (4th Cir. 1981), and an ALJ is afforded "great latitude in posing hypothetical questions[,]" *Koonce v. Apfel,* 1999 WL 7864, at *5. While questions posed to the vocational expert must fairly set out all of the claimant's impairments, the questions need only reflect those impairments supported by the record. *Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (citing *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987)). However, the ALJ is not obligated to accept or rely on the VE's testimony in response to limitations that are not supported by the record. *Youkers v. Colvin*, 2014 WL 906484, at *11 (S.D. W. Va. Mar. 7, 2014). Here, in making his RFC determination, the ALJ opted for the limitations outlined in his first hypothetical. Remand is not required based on the VE's testimony. *Mickles v. Shalala,* 29 F.3d at 929 n.7 (concluding that the hypothetical presented to the VE need only include the impairments and limitations that the ALJ finds credible).

The ALJ has the duty to weigh the evidence, resolve material conflicts in the record, and decide the case accordingly. *See Richardson v. Perales*, 402 U.S. at 399. The ALJ met his statutory and regulatory obligation to assess all of the evidence in the record. This court may not reweigh the evidence or substitute its own judgment for the Commissioner's, even if it finds the evidence is susceptible to more than one rational interpretation. *See Hays*, 907 F.2d at 1456. Here, the ALJ considered the entire record, and substantial evidence supports his RFC determination. The ALJ's analysis of the evidence provides a logical bridge between the evidence and his RFC findings. *Bennett v. Astrue*, No. 1:10-CV-1931-RMG, 2011 WL 2470070, at *3 (finding the ALJ's RFC assessment consistent with the regulations and "that the ALJ's opinion sufficiently explained

how he determined Plaintiff's RFC...."). Therefore, the undersigned recommends a finding that the ALJ did not fail to assess Plaintiff's RFC to such an extent that it would require remand.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

February 4, 2021                                            Kaymani D. West
Florence, South Carolina                                    United States Magistrate Judge